[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
In this proceeding, Vernon Publishing, Inc., plaintiff-lessee of land and improvements at 9 Hartford Turnpike, and Mary E. Wolff, Trustee, plaintiff-owner of that property, originally appealed from the action of the board of tax review (the Board) of Vernon concerning the valuation or their property on the list of October 1, 1991. The plaintiff-lessee is a party to the appeal because, under the terms of a lease, the plaintiff-lessee is obligated to pay the taxes on the property; the lease, however, is not an arm's-length transaction because of a relationship between the plaintiff-owner and a principal of the plaintiff-lessee. Although the original appeal relates only to the list of October 1, 1991, the plaintiffs have amended the original appeal so that it now includes also the lists of October 1, 1992, and October 1, 1993.
The plaintiffs' original appeal is dated June 17, 1992. In the First Count of the appeal, the plaintiffs claim that the valuation that the assessors placed on the property for purposes of taxation by Vernon (hereinafter, "Vernon's valuation") violates Conn. Gen. State. sec. 12-64. That statute provides that property not exempt from taxation shall be liable to taxation at a uniform percentage of "its present true and actual valuation." The plaintiffs claim that Vernon's valuation, which the Board declined to change, exceeded "its present true and actual valuation." By the provisions of Conn. Gen. Stat. sec. 12-63, the words "present true and actual valuation" mean "fair market value" and "not . . . value at a forced or auction sale." The words "actual valuation, market value, actual value, fair market value, market price and fair value are synonymous in the valuation of property for assessment purposes." Uniroyal, Inc.
CT Page 5594v. Board of Tax Review, 182 Conn. 619, 623 n. 8, 438 A.2d 782
(1981). As required by statute, for purposes of local taxation Vernon has assessed property liable to taxation "at a uniform rate of seventy percent of present true and actual value."
In the Second Count of the appeal, the plaintiffs claim that Vernon's valuation "could not have been arrived at except by disregarding the statutes for determining the valuation of . . . property." The quoted words are identical with those in Conn. Gen. Stat. sec. 12-119. Even though the Second Count does not specifically refer to Conn. Gen. Stat. sec. 12-119, the repetition of the quoted words in the Second Count clearly shows that the plaintiffs intend the Second Count to state a ground or relief under Conn. Gen. Stat. sec. 12-119. To prevail under that statute, "The plaintiff . . . must satisfy the trier . . . there was misfeasance or nonfeasance by the taxing authorities, or the assessment was arbitrary or so excessive or discriminatory as in itself to show a duty on their part." (citation and internal quotation marks omitted.) "Only if the plaintiff is able to meet this exacting test by establishing that the action of the assessors would result in illegality can the plaintiff prevail in an action under sec. 12-119." Second Stone Ridge Cooperative Corporation v. Bridgeport, 220 Conn. 335, 341, 597 A.2d 326 (1991). The plaintiffs' evidence and claim, limited to overvaluation, does not "meet this exacting test," and the issues on this count are round for the defendant.
By stipulation of the parties, the plaintiffs' appeal has been referred to me, as a state trial referee, for a hearing and entry of judgment. In the course of the hearing, several exhibits were introduced; the court heard testimony and received appraisals from both an appraiser for the plaintiffs and an appraiser for the defendant; and heard testimony from another appraiser and from an officer of the Plaintiff-lessee. (The appraisal or the appraiser for the plaintiffs will sometimes be referred to hereinafter as "the plaintiffs' appraisal, "and that of the appraiser for the defendants as "the defendant's appraisal.")
 I
The location of the plaintiffs' property is identified variously as Connecticut Route 30 and 83; 9 Hartford Turnpike; 1 Main Street Talcottville; Tolland Turnpike: and, in error, Talcottville Road. The latter actually begins, as a northerly continuation of Connecticut Route 83 only, approximately 3500 feet northerly of the plaintiffs' property. At that point, Connecticut Route 30 separates from CT Page 5595 Connecticut Route 83 and turns easterly at the Exit 65 interchange of Interstate 84.
The plaintiffs' property forms a rectangle consisting of 15,797 square feet, with 80 feet of frontage on Hartford Turnpike. Approximately 2,852 square feet at the rear of the plaintiffs' property are located in Manchester. Only the approximately 12,945 square feet that are located in Vernon are considered in this memorandum and in both appraisals. A utility easement and driveway traverse the property for a width of 15 feet along the eastern boundary. The property has available sanitary sewers, electricity, and telephone service but no public water service. Water is obtained from an on-site well. The property is in a wetland zone. In the immediate vicinity of the property is a mix of several retail, commercial, and light industrial uses. Illustrating the range of the mix, to the west is a Garden Center and to the east , a Chrysler-Plymouth agency. The plaintiff-lessee uses the improvements on the property for a combination of office space and warehouse space. The Commercial 10 Neighborhood Commercial Zone that the plaintiffs' land is located in permits these uses. The uses that the plaintiff-lessee makes of the improvements are the highest and best uses that can be made of the improvements.
The improvements consist of a 5870 square-foot one-and-two-story masonry and wood frame building, originally built in 1961. The front of the building has a two-story portico with four columns. Approximately 2758 square feet of the building are finished office-space; the remaining 3112 square feet are an unfinished warehouse and minimally-finished work area. The layout of the building, however, is such that its Net Rentable Area is only 5458 square feet. Heat is provided to the finished office areas by oil-fired forced-air units, and air conditioning, by roof-mounted units. The building has five rest rooms these contain a total of seven sinks and five toilets. The building is in average condition for a 30-year-old building.
 II
The assessors and the appraisers made the following valuations for the plaintiffs' property:
 Vernon's Valuation of Land: $107,200 Vernon's Valuation of Improvements: $284,700 Total Vernon's Valuation: $391,900
Plaintiffs' Appraisal, Land Improvements: $215,000 CT Page 5596
Defendant's Appraisal, Land Improvements: $280,000
In addition to the above appraisal, the plaintiffs' appraiser, using the income Capitalization Approach, appraised the land and improvements at $205,000. His $215,000 appraisal is based on the Sales Comparison Approach. Both appraisers used both the Income Capitalization Approach and the Sales Comparison Approach.
 III
The Income Capitalization Approach used by both appraisers is a capitalization of net income. This method requires first, in the present case, a valuation of the fair market rental value of the premises, to determine the annual gross potential income. The plaintiffs' appraiser found the gross potential income to be $41,761, an amount arrived at by valuing 2758 square feet at $9.50 per square foot ($26,201), plus 3112 square feet at $5.00 per square foot ($15,560). The defendant's appraiser found the gross potential income to be $49,122, an amount arrived at by valuing the 5458 square feet of Net Rentable Area at $9.00 per square foot. Although the interior of the property has different uses, those uses could change as the requirements of the tenant change, and the defendant's appraiser could properly elect to ascribe a uniform per square foot appraisal to all the Rentable Area. See Greenfield Development Co. v. Wood,172 Conn. 446, 449, 374 A.2d 1084 (1977). Further, by using Net Rentable Area instead of the gross interior space, the defendant's appraiser as to the credibility of his appraisal. On the other hand, by not using the result of his Income Capitalization Approach calculations as his final valuation, the plaintiffs' appraiser detracts from the credibility of those calculations. The court is of the opinion, and finds, that the annual gross potential income of the plaintiffs' property, as of October 1, 1991, is $49,122.
Both the plaintiffs' appraiser and the defendant's appraiser included in their appraisals schedules showing operating expenses as estimated by the plaintiff-lessee. The expenses for "vacancy and collection loss," and "management" are, in both appraisals, a percentage of the potential gross income. For that reason, the court will use the schedule of the defendant's appraiser (Exhibit 1, p. 44), which shows $49,122 as the potential gross income. That schedule show operating expenses of $19,644 plus a "vacancy and collection loss" of $1,474, leaving a Net Operating Income of $28,004. The court is of the opinion, and finds, that the Net Operating Income of the plaintiffs' property as of October 1, 1991 is $28,004. CT Page 5597
The next step in the Income Capitalization Approach is to determine the appropriate capitalization rate. Both appraisers used the "Tax-Loaded Capitalization Rate" method for determining an appropriate capitalization rate. This method requires, first, that the estimated taxes included as part of the expenses in determining net operating income be added back into the net operating income. The effect of the taxes on the fair market value of the property is then accounted for by adding to the basic capitalization rate the product resulting from multiplying the anticipated mill rate (28.05 mills) by the uniform 70% assessment rate (.02805 x .70 ) or .01963. Using this method, the appraiser for the plaintiffs found the "Tax Loaded Capitalization Rate" to be 12.66%, and the appraiser for the defendant, 12.71%. The net operating income ($28,004) plus estimated taxes ($7,695) total $35,699. Dividing that total "Tax Loaded Capitalization Rate" of 12.66% yields a fair market value or $281,982 and, by the "Tax Loaded Capitalization Rate" of 12.71%, a fair market value of $280,873. The court rounds both these totals to $280,000 and finds the fair market value of the plaintiffs' property on October 1, 1991, to be $280,000.
 IV
The plaintiffs' appraisal notes, "The Sales Comparison Approach had limited, but adequate, data." The court agrees that that approach had limited date. Of the four "comparable" sales listed by the plaintiffs' appraisal, only one is in Vernon. "In determining values by comparison, the properties must be similarly located and of like character." Thaw v. Fairfield, 132 Conn. 173, 179, 43 A.2d 79 (1945). The Vernon "comparable" is situated at 309 Talcottville Road and relates to a sale in April, 1992. To attempt to establish comparability of that sale with the plaintiffs' property, the plaintiffs' appraisal had to make a negative adjustment of 61.5% The extent of those adjustments suggests to the court limited comparability. The same suggestion applies to a "listing" at 280 Talcotville Road, cited in the plaintiffs' appraisal, where the net adjustments total 84.5%.
Similarly, the Sales Comparison Approach of the defendant's appraisal has limited data. Of the three "comparables" cited, only one is in Vernon, at 30 Hartford Turnpike. There, even after assuming a reduction or the purchase price from $175,000 to $125,000, to adjust for $50,000 worth or banking equipment included in the sale, the 1200 square-foot branch-bank building had an adjusted sale price of $104.17 per square foot.
The court does not agree with the plaintiffs' appraisal that the CT Page 5598 Sales Comparison Approach has "adequate" data. The court is of the opinion, and finds, that all seven "comparables, "plus the "listing", are of insufficient probative value to warrant drawing any reasonable inferences from them as to the value of the plaintiffs' property on October 1, 1991.
 V
Neither appraisal makes a valuation for land separate from the valuation for the improvements. The only basis that the court can use in making those separate valuations is the same land/improvements ratio that the assessors of Vernon made in Vernon's valuation, i.e. land 27.35% ($107,200) and improvements 72.65% ($284,700). The court will make those valuations pro forma, without prejudice to the right of either party to object and to request a hearing on that issue.
 VI
On the First Count, judgment may enter that the true and actual value of the plaintiffs' property at 9 Hartford Road, Vernon, is $280,000, as of October 1, 1991, October 1, 1992, and October 1, 1993; and judgment may further enter, pro forma, that the true and actual value of the plaintiffs' land on those dates is $76,580 and that the true and actual value of the improvements on that land on those dates is $203,420.
On the second count, judgment may enter for the defendant.
Counsel for the plaintiffs is to draft the judgment file and to submit it to counsel for the defendant for approval. If counsel are unable to agree on the form of the judgment file, counsel for the plaintiffs is to notify Faith Yarusewicz, Judge's Secretary, Tolland Superior Court, and the court will schedule a hearing on the matter. If counsel are in agreement, counsel are to endorse their approval on the judgment file and submit it to the clerk.
Rubinow State Trial Referee